649 A.2d 1204

**Daniel E. PATRICK, Sr., Personal Representative of the Estate of Edna Lorraine Patrick**

v.

**Rosalie PATRICK, et al.**

**No. 320, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Dec. 2, 1994.

Timothy P. Thurtle (Saul McCormick, on the brief), Glen Burnie, for appellant.

J. Darby Bowman (Morrow & Hassani, P.A., on the brief), Towson, for appellees.

Argued before WENNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Appellant, Daniel E. Patrick, Sr., personal representative of the estate of Edna Lorraine Patrick (the testatrix), appeals from the judgment of the Circuit Court for Baltimore County. The trial court found that the testatrix had attempted to revoke a $5,000 bequest to her granddaughter, Rachel, in trust, and a bequest of one-half of the residuary estate to her son, David, by drawing lines through portions of her will. It determined that the testatrix's attempt was an attempt to create a new will and was, thus, ineffective. The trial court then held that the first will, the will as it existed without the deletions, remained operative. Appellant raises the following questions:

1. Does Section 4–105 of the Estates and Trusts Article provide for partial revocation by the Testatrix through the cancelling of certain provisions in her will without adhering to the statutory requirements of Section 4–102 of the Estates and Trusts Article?

2. If the statutory language is clear and unambiguous, can the trial court consider prior statutes based on slightly different language and its accompanied case law, in order to determine the legislative intent of a clearly drafted statute?

3. Should Maryland's restricted approach to partial revocation be followed when other jurisdictions provide a much better method by employing a literal approach to Section 4–105 of the Estates and Trusts Article?

We shall reverse the order of the trial court as to the $5,000 bequest to Rachel because, as to that bequest, we believe that the trial judge read the language from two early Court of Appeals cases, which interpreted an earlier version of § 4–105

of the Estates and Trusts Article, too broadly. We shall otherwise affirm. We explain.

## THE FACTS

As relevant to this appeal, the testatrix's will provided (with the lined and emphasized portions representing the text she crossed out and the portions enclosed in brackets representing the text she added):

### LAST WILL AND TESTAMENT

### OF EDNA LORRAINE PATRICK

I, EDNA LORRAINE PATRICK of Baltimore County, Maryland, being of sound mind and memory, and not acting under duress, menace, fraud or undue influence of any person whatsoever, do make, publish and declare this to be my Last Will and Testament, and I revoke all previous Wills and Codicils made by me.

FIRST: I direct that all my just debts, expenses of my last illness and funeral, expenses of the administration of my estate, and estate and inheritance taxes on the whole of my estate be paid out of the first available funds as administrative expenses.

SECOND: I give, devise and bequeath the sum of One Hundred ($100.00) Dollars to each of my grandchildren. [Rick's and Dave's] I give, devise and bequeath the additional sum of Five Thousand ($5,000.00) Dollars to my grandchild Rachel, in trust until her 18th birthday at which time it is to be distributed to her along with any accumulated earnings.

THIRD: I give, devise and bequeath all the rest and residue of my property, after payment of debts, expenses and taxes provided for in the First Item above, whether such property be real, personal or mixed, of whatever kind or character or wheresoever situated to my sons, Daniel E. Patrick, Sr. and David M. Patrick, Sr., equally, share and share alike.

The trial court held, and neither party disputes, that the testatrix had made the changes in the will and that she "had the intent to alter the Will as initially executed and thereby to strike provisions which would have benefitted her son, David, and his heirs." (Footnote omitted.) Specifically, the trial court found that she attempted to revoke the $5,000 bequest to her granddaughter, Rachel, apparently the daughter of David, in trust, and the bequest of one-half of her residuary estate to her son David M. Patrick, Sr.

## LEGAL ANALYSIS

Appellant contends that the trial court erred by not following the literal language of Md.Code (1974, 1991 Repl.Vol.), § 4–105 of the Estates and Trusts Article and by following the precedent of two Court of Appeals cases that interpreted an earlier statute that used the word, "clause," instead of the word, "part," which is currently used. As stated above, we believe that the trial court erred in its interpretation of those Court of Appeals cases, but we agree with the trial court in its holding that the legislature did not intend to change the meaning of § 4–105 when it substituted the word, "part," for the word, "clause."

Section 4–105 currently reads, in pertinent part:

A will, *or any part of it,* may not be revoked in a manner other than as provided in this section.

(1) *Subsequent will.*—By provision in a subsequent, validly executed will which (i) revokes any prior will or part of it either expressly or by necessary implication, or (ii) expressly republishes an earlier will that had been revoked by an intermediate will but is still in existence;

(2) *Destruction.*—By burning, cancelling, tearing, or obliterating the same, by the testator himself, or by some other person in his presence and by his express direction and consent.... [Emphasis added.]

The 1991 replacement volume of the Estates and Trust Article does not contain any Revisor's Note or Comment. The 1974 volume, however, did. The Revisor's Note from that

volume provided, "This section formerly appeared as Article 93, § 4–105. Changes are in style and language." The Comment to former Article 93, § 4–105 provided, in pertinent part:

This section adopts, without change of substance, former § 351, which was recently reconsidered and amended by the General Assembly.

Article 93 § 351, in turn, provided:

No will or codicil in writing, *nor any clause thereof,* shall be revoked otherwise than as provided herein:

(a) By some other will, codicil, or other writing, executed as provided in § 350, altering or revoking said will or codicil.

(b) *By burning, cancelling, tearing or obliterating the same,* by the testator himself, or by some other person in his presence and by his express direction and consent. [Emphasis added.]

Appellant requests that we ignore the Comment to section 4–105, which would then permit us to ignore the Court of Appeals's decisions interpreting language very similar to that of Article 93 § 351. By examining the current language of section 4–105 of the Estates and Trust Article in this vacuum, appellant suggests that, under the plain meaning rule of statutory construction, the testatrix was allowed to strike certain portions of her will regardless of the effect this would have on the rest of her will. We disagree and explain.

■ In *Barr v. Barberry Bros., Inc.,* 99 Md.App. 33, 38–39, 635 A.2d 64 (1994), we quoted from *Mazor v. Dep't of Correction,* 279 Md. 355, 360–61, 369 A.2d 82 (1977), and *Subsequent Injury Fund v. Ehrman,* 89 Md.App. 741, 746–47, 599 A.2d 875 (1992), and stated:

[S]ix principal guidelines of statutory interpretation [are]:

"The cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature. . . .

The primary source from which we glean this intention is the language of the statute itself....

And in construing a statute we accord the words their ordinary and natural signification....

If reasonably possible, a statute is to be read so that no word, phrase, clause or sentence is rendered surplusage or meaningless....

Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences....

Moreover, if the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature."

While the language of the statute is the primary source from which to glean the legislative intent, we do not ignore other possible sources of that intent. The Court of Appeals, in *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513–14, 525 A.2d 628 (1987), stated:

Of course, in our efforts to discover purpose, aim, or policy we look at the words of the statute. That is the thrust of the plain-meaning rule relied on by Kaczorowski, and the rule comports with common sense, because what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal. But the plain-meaning rule is not rigid.

We also recognize the rule that where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. *State v. Fabritz*, 276 Md. 416, 348 A.2d 275 (1975); *Height v. State*, 225 Md. 251, 170 A.2d 212 (1961). In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that

construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense. *Tucker* [*v. Fireman's Fund Ins. Co.*], 308 Md. [69] at 75, 517 A.2d [730] at 732 [ (1986) ] [some citations omitted].

The Court added:

When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed in the Annotated Code. We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

. . . Thus, in *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51, (1987), we held that when a motor vehicle is forfeited under Art. 27, § 297, and is then sold in a commercially reasonable manner, the person who owned it prior to forfeiture is not prohibited from purchasing it. 309 Md. at 345–47, 524 A.2d at 60. Although we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." At 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form (At 327–30, 524 A.2d at 51–52), prior legislation (At 330, 524 A.2d at 52), a legislative committee report (At 331, 524 A.2d at 53), a bill title (At 331, 524 A.2d at 53), related statutes (At 335–41, 524 A.2d at 55–58) and amendments to the bill (At 341–44, 524 A.2d at 58–59). *See also Ogrinz v. James*, 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation

that we did not identify as ambiguous or of uncertain meaning. At 390, 524 A.2d at 82.

*Id.* at 514–15, 525 A.2d 628.

In *Office & Professional Employees Int'l Union v. MTA,* 295 Md. 88, 100–01, 453 A.2d 1191 (1982), the Court stated:

A change in the phraseology of a statute as part of a recodification will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable. *Bureau of Mines v. George's Creek,* 272 Md. 143, 155, 321 A.2d 748 (1974).

Moreover, the Revisor's Note to § 7–601 confirms that no substantive change was intended. The note states as follows:

"This section is new language derived without substantive change from the first paragraph of former Article 64B, § 37(b)."

The notes or reports of a revisor ´or revision commission are entitled to considerable weight in ascertaining legislative intent. *Briggs v. State,* 289 Md. 23, 30–31, 421 A.2d 1369 (1980); *Bureau of Mines v. George's Creek, supra,* 272 Md. at 155 [321 A.2d 748]; *Allers v. Tittsworth,* 269 Md. 677, 683, 309 A.2d 476 (1973).

*See also Dean v. Pinder,* 312 Md. 154, 162–63, 538 A.2d 1184 (1988):

When the transfer and recordation tax statutes were recodified into the Tax–Property Article in 1986, the Legislature deleted the word "actual" when referring to the consideration upon which the tax is to be imposed. 1985 Md.Laws Ch. 8 § 2. The Revisor's Notes to these amendments provide that the new language is derived without substantive change from the former recordation and transfer tax provisions, indicating that the word "actual" was not intended as the restrictive modifier that the Deans suggest. It is a well-settled practice of this Court to refer to the Revisor's Notes when searching for legislative intent of an

enactment. *Allers v. Tittsworth*, 269 Md. 677, 683, 309 A.2d 476, 480 (1973).

*Allers v. Tittsworth*, 269 Md. 677, 683, 309 A.2d 476 (1973): The practice of considering revision commission reports in searching for legislative intent is too well established to be open to question. See Meyer, *Legislative History and Maryland Statutory Construction*, 6 Md.L.Rev. 311, 314–15 (1942), citing *Strauss v. Heiss*, 48 Md. 292, 296 (1878) and *Public Service Commission v. Sun Cab Co.*, 160 Md. 476, [*West v. Sun Cab Co.*] 154 A. 100 (1931).

*Barr*, 99 Md.App. at 40, 635 A.2d 64:

We further noted in [*C & R Contractors v.*] *Wagner*, 93 Md.App. [801] at 809 [614 A.2d 1035 (1992) ], that when substantive changes are made it indicates an "intent to change the meaning of that statute." We also perceive that the opposite, *i.e.,* no substantive change, reflects a legislative intent that the meaning of the statute is *not* meant to be changed.

We additionally note that other authorities have not discerned any significant difference between the words, "clause" and "part," as they are used in this context.

*Eschbach v. Collins*, 61 Md. 478 (1884), and *Home of the Aged v. Bantz*, 107 Md. 543, 69 A. 376 (1908), are the two cases that the trial judge relied on in deciding that the alterations that the testatrix made to her will were invalid. The facts of *Eschbach*, briefly stated, are that the testator had ten children, seven sons and three daughters, and divided his estate into ten equal parts; each child receiving an "equal share." He gave eight of his children a life estate in their respective part with a remainder to their children. To his two eldest sons, the testator gave each a part absolutely and in fee. Later, the testator crossed out the names of his two eldest sons, but left the words, "sons," which preceded their names. The Court was divided over the effect that this obliteration had on his will. The majority of the Court believed that the altered will gave each of the seven sons their shares absolutely and in fee. The other members of the Court believed that the

altered will gave all of the testator's children life estates in their respective shares with remainders to their children. The Court, however, was in unanimity over the issue of whether the will, as altered, was valid; all agreeing that it was not.

In *Bantz*, the testator crossed out portions of his will that disposed of the remainder of his estate after a trust created for the purpose of paying income to his wife for her life was to cease (at her death). The Court held that the effect that the obliteration had on the will was to cause the remainder to pass through intestacy. The Court held that the will, as altered, was valid.

Chief Judge Alvey, in his concurring opinion in *Eschbach*, 61 Md. at 502, noted that the language of then Art. 93, sec. 302, "No devise in writing of lands, etc., or *any clause thereof*, shall be revocable otherwise than by some other will or codicil in writing," "was literally transcribed from sec. 6 of the Statute of Frauds. . . ." 2 W. Page, Wills § 21.19 (3d ed. W. Bowe & D. Parker 1960) at 374 notes that statutes that use the word "clause" borrow that language from the Statute of Frauds, while statutes that use the word "part" borrow that language from the Wills Act of Victoria. Other than noting that distinction, the treatise treats both words synonymously. Mellish, L.J., wrote in *Swinton v. Bailey*, 45 L.J.Ex.D. 427, 429 (1876), *aff'd*, 48 L.J. 57 (1878):

> I think the word "clause" is not used in any strict or technical sense, but that really it merely means the same thing as "part." I think it really has the same effect as appears to have been stated by Sir Herbert Jenner Fust, that the clause in the new Wills Act, which speaks of "any will or any part thereof," really is the same thing as what is here spoken of as a "will" or a "clause," and I think we should interpret the words "part thereof," as meaning part of the will.

We do recognize that the concurrence in *Eschbach* noted the above quote from the *Swinton* case, while Judge Yellott, writing for the majority in *Eschbach*, stated:

The only principle determined in this case [*Swinton* ] was that an estate might be diminished by the erasure of certain words, and any general observations, made by judges, which extended beyond the scope of the question in controversy, could hardly be recognized as establishing a safe precedent even within the jurisdiction where the decisions of that court must be received as authoritative.

61 Md. at 496. We further recognize that the majority in *Eschbach* stated:

What then is a clause? Does it consist of two or three words which, disjoined from the context and transferred to a separate sheet of paper would be devoid of sense or meaning? Do the mere names of two persons constitute a clause? Is not a clause always understood to mean one of the subdivisions of a written or printed document? Is the word ever used in any other sense? Wills are frequently subdivided into a number of clauses.... Is it not apparent that the statute has reference to one of these subdivisions of a will when the word clause is used in connection with revocation?

*Id.* at 498–99.

The point of departure, however, between the majority and concurring opinions in *Eschbach* was the interpretation each side gave to the erasures in the will. The majority believed that the erasures had the effect of giving all the testator's sons fee simple estates, whereas, before the erasures, only two of the sons would have received fee simple estates while the other five would have received life estates only. Chief Judge Alvey, on the other hand, although concurring in the results, asserted that the erasures had the effect of taking a fee simple estate from two of the sons and leaving all ten children with life estates in the trust. He believed, nevertheless, that the attempted revocation was invalid because "[s]uch revocation ... if allowed to have effect would not only cut down the greater to less estates, so far as the two sons are concerned, but would have the further effect to give new estates to other parties, or to enlarge the estates of other devisees; and that

being the case, the attempted revocation *pro tanto* cannot be allowed to take effect." *Id.* at 506. We, therefore, think that the majority was not attempting to note any disagreement with the *Swinton* decision concerning its interpretation of the word, "clause," as our review of that case leaves no doubt in our mind that the issue of how to interpret the word, "clause," was presented to, and determined by, that court.[1]

■ We hold, therefore, that the legislature, by substituting the word "part" for "clause," did not intend that section 4–105 would have a different meaning from the earlier statute, Article 93 section 351. This, however, does not resolve the issue, as we must still determine whether the attempt to revoke the two provisions in the will were valid under Maryland law as expressed by the Court of Appeals in *Eschbach v. Collins, supra,* and *Home of the Aged v. Bantz, supra.*

In *Eschbach,* 61 Md. at 499–500, the Court interpreted essentially the same language from an earlier statute (the word, "clause," was used in that statute) and stated:

It is not necessary that the words erased should be wholly illegible, but the act of the testator must be such as to clearly indicate an intention to expunge the whole clause, so that it shall no longer constitute a subdivision of the will. But when by the obliteration of certain words a different meaning is imparted, there is not a mere revocation. There is something more than the destruction of that which has been antecedently done. There is a transmutation by which a new clause is created. There is another and a distinct testamentary disposition which must be authenticated by the observance of the statutory requirements.

As we have indicated, in *Eschbach* the testator originally had his will drafted so as to divide his estate into ten equal parts, with two of his seven sons, whom he specifically named, taking a fee simple interest and the rest taking a life estate in

---

1. The majority in *Eschbach* probably was referring to the *Swinton* decision of the House of Lords, which affirmed the Court of Appeal, wherein one of the judges expressed the opinion that any obliteration of words, regardless of its effect on the rest of the will, would be valid.

a trust. The testator then attempted to change his will by crossing out the names of his two sons who were to take a fee simple interest, leaving the word "sons." The majority believed that to allow this, the court would have permitted all of the testator's sons to take a fee simple interest, thus increasing the share of those sons who were originally only given a life estate in the trust.

The attorney who was attempting to have the Court invalidate the attempted partial revocation provided an example which highlighted the Court's concern:

> As aptly illustrated by learned counsel in argument, if the words were "to my son William I give nothing, and give all my estate to my son John," the will could be made to read, without the insertion of any additional words, "to my son William I give all my estate."

*Id.* at 500.

In *Bantz,* 107 Md. at 555, 69 A. 376, the Court noted:

> In *Eschbach v. Collins,* 61 Md. 478, we distinctly recognized the right of a testator to revoke one or more clauses of his will without invalidating the rest of it, if such revocation *does not operate to enlarge the estate of any one who takes under the same will,* or to change the character of the remaining provisions of the instrument. [Emphasis added.]

In *Bantz,* the Court held that the testator revoked a clause in his will without invalidating the entire will. The effect of the revocation was to increase the amount of the estate that passed through intestacy.

In the case *sub judice,* the revocation of the $5,000 bequest to Rachel in trust enlarges the residuary estate and the revocation of one-half of the residuary estate going to David increases Daniel's share of the residuary estate. The trial judge stated that "there is no question but that the attempted cancellation by the Testatrix would run afoul of the *Eschbach/Bantz* limitation and be legally ineffective" because "[c]ancellation here would mean one son, David, and his heirs would get less and the other son, Daniel, and his heirs would receive an enlarged estate." We believe, however, that, when

the Court of Appeals in *Eschbach* and *Bantz* prohibited a revocation of a clause that would "enlarge the estate of anyone taking under the will," it was not referring to a revocation that increases the value of a legatee's interest in the residuary estate.

■ Neither the *Eschbach* nor *Bantz* cases specifically addressed whether the revocation of a bequest or devise that merely increases the "residuary estate," such as the $5,000 bequest to Rachel in trust, "operate[s] to enlarge the estate of any one who takes under the same will, or to change the character of the remaining provisions of the instrument." In holding that it does not enlarge the estate of anyone taking under the will, we note that the word, "estate," is capable of more than one meaning. The court in *Fletcher Trust Co. v. Morse,* 97 N.E.2d 154, 162–63 (Ind.App. in banc 1951), stated:

> The varied meaning given to the word "estate" is cause for much of this conflict which seems to appear in the cases. For example, where the word "estate" is used as describing the character of the fee as from a life estate to a fee simple estate, revocation resulting in an increase thereof is not permitted. *Eschbach v. Collins,* supra. However, where the word "estate" is used in its larger sense as pertaining to "beneficial interest", *Swinton v. Bailey,* supra, or the "residuary estate", *Brown v. Brown,* supra [ (1912), 91 S.C. 101, 74 S.E. 135]; such increases in remaining devisees are permitted.

Although that court was subsequently reversed on other grounds, we agree with its observation that the *Bantz* Court's use of the word, "estate," was in the narrow context of prohibiting an enlargement of the character of the legal estate, *i.e.,* life estate to fee simple.

Having determined that the revocations attempted in the case *sub judice* do not "enlarge the [type of] estate of any one who takes under the same will," we must now examine whether the revocations "change the character of the remaining provisions of the instrument." We shall first examine whether

the revocation of the $5,000 bequest in trust to Rachel changes the character of the remaining provisions.

The revocation of the bequest to Rachel increases the residuary estate. Residuary clauses are very common in wills. Except in rare circumstances,[2] any revocation of a clause or part of a will does increase the residuary estate.

We do not believe that the legislature or the Court of Appeals intended that every attempted partial revocation that merely increases the value of residuary estates must fail. We note that the Court in *Eschbach* cited with approval the Massachusetts case of *Bigelow v. Gillott*, 123 Mass. 102 (1877), stating:

> [T]here was an entire obliteration of the sixth and thirteenth clauses of the will by ink lines drawn through and across every word constituting those clauses. This was held to be a revocation of these two clauses; leaving intact the other clauses in the will.

61 Md. at 498. Significantly, there was a residuary clause in *Bigelow*, and the effect of the revocation of the two clauses was to increase the value of the residuary estate.

The majority position taken by those states that have addressed the issue is that a partial revocation that increases the residuary estate is valid. *See* Note, *Partial Revocation of Wills by Acts Done to the Instrument*, 23 Harv.L.Rev. 559 (1909) ("[T]he ... view of the majority is that the residuum is a "catch-all" gift and that the increase passes under a properly attested clause.") (Footnote omitted.) In *Meredith v. Meredith*, 35 Del. 35, 157 A. 202, 205 (1931), the court stated:

> While the effect of the cancellation in the present case was to make a change in the will to the extent of increasing her residuary estate, yet this may be regarded as an

---

**2.** One instance where the residuary estate was not increased by a partial revocation was in *In re Okowitz's Estate*, 403 Pa. 82, 169 A.2d 84 (1961). In that case, the residuary estate was divided into set percentages. The revocation was to one taking under the residuary clause. That revocation caused that interest to pass through intestacy.

incident to the cancellation and not such a change in the original will as could be made only by a codicil or a new will.

In *Swan v. Swan*, 154 Me. 276, 147 A.2d 140 (1958), the court permitted a partial revocation where the property then passed through the residuary clause. The court stated:

There is a hard core of formal logic in such a position [refusing to permit such property to pass through the residuary clause] but the contrary opinion which entails only danger, if any, more speculative than realistic is better adapted to achieve justice.

*Id.* 147 A.2d at 144. In *Brown v. Brown*, 91 S.C. 101, 74 S.E. 135, 136 (1912), the court stated:

The increase of the residuary estate which may result from the obliteration is not a new testamentary disposition, but a mere incidental consequence resulting from the exercise of the power conferred on the testator by the statute.

In *In re Appelton's Estate*, 163 Wash. 632, 2 P.2d 71, 76 (1931), the court stated:

We have nothing in this record indicating the value of the [diamond] earrings [one of the bequests that had been revoked].... Under all the circumstances, we cannot conclude that Mrs. Appelton's canceling of this bequest so vitally enhanced the residuary bequests ... as to impair those bequests, or any other portion of the will....

In *Estate of Becklund*, 7 Wash.App. 10, 497 P.2d 1327, 1332 (1972), the court stated:

If the result of the partial revocation only causes an increase in the residuary estate rather than such a vital enhancement thereof as to constitute a new scheme, this is not a disparate testamentary disposition but only a consequence resulting from the exercise of the power given the testator by the statute.

We note that not every partial revocation that increases the value of the residuary estate changes the character of that provision. We also believe, however, that it is possible for a partial revocation of a will to increase the value of the residu-

ary estate to such an extent that it would change the character of that provision. Thus, we believe that the approach that we observe the Washington courts have taken to be most appropriate. Specifically, if the $5,000 bequest to Rachel can be considered minor in respect to the testatrix's entire estate, then the revocation of that bequest should stand. As the value of the testatrix's estate was approximately $150,000, we conclude that it was minor. We hold, therefore, that the revocation of the $5,000 specific bequest was valid and that, accordingly, that bequest passes under the residuary clause of the will.[3]

█ We next address whether the revocation of the bequest of one-half of the residuary estate to David changes the character of the residuary clause. The effect of that revocation is to increase Daniel's share of the residuary estate from one-half of the estate to the entire estate. This, it appears to us, is not, under the circumstances of the case *sub judice*, a mere by-product of the alterations. Rather, the primary purpose of that revocation was to effect a major change in beneficiaries and a major change in the value of the estate devised and bequeathed. The change here altered the number of beneficiaries, *i.e.*, 2 to 1, in a significant manner. Unlike the revocation of the bequest to Rachel, which merely increased the residuary estate, this revocation alters the very meaning of the residuary clause. The entire scheme is changed, *i.e.*, the testatrix, who left half of her estate to a devisee under the original will, now leaves it all to that devisee after the change. We believe that this revocation changes the character of the will and, in order to be effective, must be accompanied by the necessary formalities. *See Appelton*, 2 P.2d 71 (Wash.1931), where the court declared that the testatrix's attempt to alter the residuary clause in such a manner as to increase the share of one taking under the residuary clause from one-half of the residuary estate to all of it was

---

**3.** At oral argument, appellee's counsel agreed that the revocation of the $5,000 bequest to Rachel should be allowed.

**456**

invalid because such alteration altered the testamentary disposition of the will.

JUDGMENT AS TO THE SPECIFIC BEQUEST OF $5,000 REVERSED; JUDGMENT OTHERWISE AFFIRMED; COSTS TO BE PAID BY APPELLANT.